**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

DEREK A. HEYLIGER,

                              Plaintiff,

          v.

                                                        No. 9:18-CV-1113
MICHAEL IFFERT, et al.,                                 (LEK/CFH)

                              Defendants.

─────────────────────────────

**APPEARANCES:**                        **OF COUNSEL:**

Derek A. Heyliger
12-B-0269
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562
Plaintiff pro se

Attorney General for the              CHRISTOPHER LIBERATI-CONANT, ESQ.
State of New York                     Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

          Plaintiff pro se Derek A. Heyliger ("plaintiff"),[2] an inmate who was, at all relevant

times, in the custody of the New York State Department of Corrections and Community

───────────────────

[1]  This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2]  Plaintiff is a serial pro se litigant who has filed seven lawsuits in this Court since 2004.  In addition to the present matter, plaintiff currently has two other actions pending before this Court.  See Heyliger v. Cymbrack et al., 9:17-CV-912 (CFH); Heyliger v. Doe #1 et al., 9:18-CV-336 (TJM/TWD).

Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, Susan Peacock ("Peacock"), Deputy Superintendent for Administration for DOCCS; Donald Venettozzi ("Venettozzi"), Director of Special Housing/Inmate Disciplinary Programs for DOCCS; and Christopher Miller ("Miller"), Superintendent of Great Meadow Correctional Facility ("Great Meadow CF"), violated his constitutional rights under the Fourteenth Amendment. See Dkt. No. 35 ("SAC").  Presently pending before the Court is defendants' motion for summary judgment. See Dkt. No. 40. Plaintiff opposed the motion. See Dkt. No. 42.  For the reasons that follow, it is recommended that defendants' motion be granted in its entirety and plaintiff's SAC be dismissed in its entirety.

## I. Background

### A. October 7, 2016 Incident

On October 7, 2016, while housed in 4 cell of the B-1 gallery of the Special Housing Unit ("SHU") at Great Meadow CF, correction officer Michael Iffert ("C.O. Iffert") issued plaintiff a misbehavior report, charging him with the following inmate rules violations: (1) failure to follow a direct order in violation of rule 106.10; (2) creating a disturbance in violation of rule 104.13; and (3) participating in a demonstration in violation of rule 104.12.  See Dkt. No. 40-3 at 17.  The misbehavior report stated, in relevant part, that, while conducting his rounds on October 7, 2016, C.O. Iffert "observed inmate Heyliger . . . of B-1-4 cell banging on his cell door and yelling loudly despite direct orders to stop.  Inmate Heyliger was acting in concert with other inmates in B-1 Gallery to disrupt the order of the unit."  Id.  As plaintiff explained in his SAC and

at his deposition, on October 7, 2016, inmates in the B-1 gallery of SHU "were banging on their cell gates" and "screaming" because commissary was late, which ultimately "turned . . . into a demonstration."  SAC at 6 ¶ 19; Dkt. No. 40-9 at 29.

## B. Tier III Disciplinary Hearing

A Tier III disciplinary hearing relating to the charges in the October 7, 2016 misbehavior report began on October 20, 2016, at Great Meadow CF with Peacock presiding as the hearing officer.  See Dkt. No. 40-4 at 2.  Plaintiff acknowledged that he was served with a copy of the October 7, 2016 misbehavior report on October 8, 2016, but "ripped it up because it was fabricated," and pleaded not guilty to all three charges contained therein.  Id.; see id. at 3.  He further indicated that he refused employee assistance to prepare for the hearing.  See id. at 3.  Plaintiff testified that, although inmates in the B-1 gallery of SHU were "acting out in concert" on the date of the incident, they did so on the other side of the gallery, that he was "the only person that was isolated . . . in 4 cell," and that, at the time of the demonstration, he "just happen[ed] to be talking to . . . one of [his] neighbors when [C.O. Iffert] was walking down the gallery and stopped at [his] neighbor's cell and started writing cell numbers down."  Id. at 4.  Plaintiff further stated that "nobody in [his] area was . . . singled out besides [him]."  Id.  Plaintiff requested to call as witnesses SHU inmates housed in the B-1 gallery in cells 3, 5, and 8.  See id. at 5.  Plaintiff also requested video footage of the B-1 gallery from the time of the incident, which he stated would "show that the CO stop[ped] ahead of [his cell] and started writing something down," but "never stopped and gave [plaintiff] a direct order to do anything."  Id. at 6.  Peacock adjourned the

hearing to obtain the requested video footage and plaintiff's inmate witnesses.  See id. at 7.

When the hearing resumed on November 22, 2016, C.O. Iffert testified that, on the date of the incident, "both Console Officers" in the B-1 gallery "had come downstairs to see what all the noise was.  And they . . . indicated 4 cell was participating."  Dkt. No. 40-4 at 9.  The hearing was then briefly adjourned and Peacock, C.O. Iffert, and plaintiff "watched the video of the incident on 10/7/16."  Id. at 10.  Following the brief adjournment, Peacock stated, "what I'm seeing is [CO] Iff[e]rt going down the gallery from the Officer's Station making his way down to the Console.  As he went down the gallery, he was writing on a paper."  Id.  She then asked C.O. Iffert, "and your testimony's you stopped at 4 cell and confirmed that it was 4 cell?"  Id.  C.O. Iffert replied, "I stopped in that area when I stopped at the Console."  Id.  Plaintiff stated that C.O. Iffert's misbehavior report "doesn't depict that you stopped in front of my cell and told me anything, can the reason I didn't have t[o] be told to stop doing something is because I wasn't doing anything[?]"  Id.  Peacock replied, "what I saw on the tape was that he did stop," to which plaintiff replied, "yeah but he didn't stop in front of my cell." Id. at 10, 11.  Peacock then asked C.O. Iffert, "when you stopped at 4 cell, did you give a direct order as your Misbehavior Report states?"  Id. at 11.  C.O. Iffert responded, "I told all of [th]em that they were kinda making noise to be quiet and the direct order is anything that (inaudible) uh anytime they creating [sic] a disturbance, they're already uh violating the many rules and policies and procedures."  Id.  Plaintiff again asked C.O. Iffert whether he "stop[ped] in front of [his cell and [gave him] a direct" order, to which Peacock replied, "I just asked him."  Id.  Plaintiff stated, "ok and (inaudible) so I'm just

4

gonna [sic] leave it at that, alright?"  Id.  Plaintiff then stated that "the video camera that is more helpful to me . . . is the one that shows the (inaudible) of the gallery, is not even available to use now I have to look at (inaudible) clearly depict and stop in front of my neighbors [sic] cell, in front of 5 cell he wrote something."  Id.

After a brief adjournment, Peacock elicited the testimony of plaintiff's requested inmate witnesses.  See Dkt. No. 40-4 at 12.  Inmate Nelson, who was housed in 3 cell of the B-1 gallery, testified that, on the date of the incident, he could hear loud banging going on "to [plaintiff's] neighbor which is 5 cell and (inaudible) just going downtown [sic] at 8 cell."  Id. at 13.  Inmate Mataguh, who is housed in 5 cell, the cell neighboring plaintiff's, testified that, on the date of the incident, a C.O. was making rounds in the B-1 gallery, but that "he didn't get nobody (inaudible) no direct order."  Id. at 15.  Inmate Mataguh also testified that he and plaintiff were talking when the C.O. was making rounds.  See id.  Further, inmate Mataguh responded in the negative to plaintiff's question of whether he heard any inmates banging on their cell gates.  See id.  In addition, inmate Craygo testified that inmates in B-1 gallery were "making noise" and that plaintiff was "having a regular conversation about something loud . . . that [he] did not hear."  Id. at 17.  Peacock asked inmate Craygo whether he "recall[ed] seeing if [C.O.] Iffert stopped at 4 cell or 5 cell?"  Id.  Inmate Craygo replied, "I don't know a word (inaudible) about that."  Id.  Moreover, inmate Craygo testified that CO Iffert "stopped at (inaudible) stopped a whole line and then get a (inaudible) line get a lotta ah rats and acknowledged me; yes he did stop and spoke to me, that's it."  Id. at 18.  Thereafter, plaintiff requested a statement written by an inmate named Randall, and Peacock

informed plaintiff that she would provide him with copies of that document the following day when the hearing resumed.  See id.

On November 30, 2016, the final day of the hearing, Peacock called Console Officer Pritchard ("Pritchard") to testify, who stated that, on October 7, 2016, he was working in a console station in the B-1 gallery that is located in such a manner that, during the incident, he could hear and see plaintiff.  See Dkt. No. 40-4 at 19.  Pritchard testified that, during the demonstration, he "could see [plaintiff] on his cell yelling and . . . was banging on his cell."  Id.  He stated that he "held up four fingers" to indicate to C.O. Iffert that the noise "was 4 cell."  Id.  Plaintiff then questioned Pritchard by asking him whether he "endorse[d]" the ticket plaintiff received for the incident, to which Pritchard replied that he had not.  See id.  Plaintiff also asked Pritchard whether an unusual incident report was written for the October 7, 2016 incident.  See id. at 21.  Peacock stated that "Pritchard wouldn't file a[n unusual incident r]eport."  Id.  Thereafter, the following exchange took place:

> Plaintiff: I just wanna [sic] object because this is (inaudible).
> This . . . uh evidence came out of nowhere.  I was not able to
> properly prepare for it like you know, first and foremost,
> Officer Birella's name is that fat dude that.
>
> Peacock: Excuse me
>
> Plaintiff: (inaudible)
>
> Peacock: I'm gonna halt your I'm gonna halt that
>
> Plaintiff: (inaudible)
>
> Peacock: alright continue with this and I will stop the hearing
> and continue without you[]
>
> Plaintiff: really?  It's not happening

> Peacock: I'm alright
>
> Plaintiff: so (inaudible)
>
> Peacock: so I'm gonna continue this hearing
>
> Plaintiff: (inaudible)
>
> Peacock: in extension the time is
>
> Plaintiff: (inaudible)
>
> Peacock: 2:15 P.M.
>
> Plaintiff: that's that

Id.  Following a brief adjournment, Peacock stated on the record that plaintiff "was

removed for disruptive behavior.  The disruptive behavior continued uh long after the

tape had stopped."  Id. at 22.  Further, Peacock stated that she would "conclude[] th[e]

hearing . . . without [plaintiff]'s presence."  Id.  Peacock then read her written disposition

on the record, wherein she found plaintiff guilty of all three charges contained in the

misbehavior report, imposed a penalty of 180 days in SHU with loss of packages,

commissary, and phone.  See id.  Peacock stated, "[t]he evidence that I relied upon is

the written Misbehavior Report and the verbal testimonies of Officers Iff[e]rt and . . .

Pritchard substantiate [sic] all charges."  Id.  Plaintiff appealed the decision

administratively.


### C. Modification and Reversal of Peacock's Hearing Decision

On February 15, 2017, upon plaintiff's administrative appeal, Venettozzi modified

Peacock's decision by dismissing the charge of participating in a demonstration,

concluding that the "misbehavior report d[id] not support the charge of 104.12."  Dkt. No.

40-3 at 11 (capitalization omitted).  As a result of this modification, plaintiff's penalty was reduced, as relevant here, to 90 days in SHU.  See id. at 10.  Plaintiff, through counsel, sought reconsideration of Venettozzi's decision.  See Dkt. No. 40-5 at 2-4.  Plaintiff argued, as relevant here, that he was improperly removed from the hearing in violation of his due process right to be present.  See id. at 4.  In March 2017, Venettozzi denied plaintiff's request for reconsideration stating, "I do not believe that there are sufficient grounds to reconsider the previous decision on [the November 30, 2016] hearing.  No further administrative action will be taken."  Id. at 1.  Thereafter, plaintiff sought review in New York State Court by filing a C.P.L.R. Article 78 petition.  See Dkt. No. 40-3 at 3-9.  On September 11, 2017, the New York State Supreme Court, Albany County, granted plaintiff's petition, annulled the determination, and directed respondents to expunge all references to the matter from plaintiff's institutional record and restore the 180 days of good time that plaintiff lost as a result of the November 2016 hearing decision.  See id. at 9.  On September 20, 2017, in compliance with the state court's judgment, Venettozzi reversed the November 2016 Tier III hearing decision and ordered that all records containing references thereto were to be expunged.  See id. at 1.

### D. Plaintiff's Pending Claims

Plaintiff commenced the present action by filing a complaint on September 17, 2018.  See Dkt. No. 1.  After the Court's initial review of plaintiff's SAC pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), the following claims remain pending: plaintiff's Fourteenth Amendment due process claims against (1) Peacock for allegedly (a) improperly removing him from his Tier III disciplinary hearing, and (b) relying upon

insufficient and false evidence in rendering her decision; (2) Miller and Venettozzi for upholding, in part, Peacock's decision; and (3) against all defendants for causing his unjustified confinement in SHU under conditions that were atypical and severe.  See Dkt. No. 34 at 4.[3]

In his SAC, plaintiff contends that Peacock violated his Fourteenth Amendment due process rights by removing him from the hearing before it ended.  See SAC at 6-7. Plaintiff states that he objected to Pritchard's testimony "because Pritchard's identity had not been included in [C.O.] Iffert's misbehavior report."  Id. at 7 ¶ 26.  Plaintiff contends that, because of his removal, he "was unable to finish his objection, or make any further objections on the record before the close of testimony."  Id. at 7 ¶ 33. Further, plaintiff contends that his removal was improper because, contrary to Peacock's statement that he was removed because of his "'disruptive behavior,'" "[a]t no point during the hearing was plaintiff disruptive.  Plaintiff did not interrupt defendant Peacock, raise his voice, or make any sort of verbal threats."  Id. at ¶ 30, 31 (quoting Dkt. No. 40-4 at 22).  Moreover, plaintiff asserts that "Peacock never specified what about plaintiff's behavior was disruptive."  Id. at ¶ 32.  In addition, plaintiff notes that he sought reconsideration following Venettozzi's modification of the hearing decision.  See id. at 10 ¶ 43.  He states that his submission of a request for reconsideration "plac[ed]

---

[3]  The Court previously dismissed, among other claims, plaintiff's Eighth Amendment conditions-of-confinement claims based on the alleged conditions of SHU.  See Dkt. No. 6 at 16, 24 (dismissing plaintiff's Eighth Amendment conditions of confinement claims for failure to state a claim); Dkt. No. 24 at 6 (dismissing plaintiff's Eighth Amendment claim, as asserted in his Amended Complaint, for failure to state a claim for the same reasoning as applied in dismissing those claims on review of the original complaint because plaintiff's Amended Complaint asserted "facts [that] mirror[ed] the facts in the Complaint" and did "not cure the deficiencies identified in the November Order."); see also Dkt. No. 34 at 2-3 (observing that plaintiff's "[p]roposed [SAC] include[d] substantially the same facts and . . . additional details related to [his] conditions of confinement in the [SHU]," which, "[b]ased upon these facts, [p]laintiff asserts [his] Fourteenth Amendment due process claims . . . against . . . Miller, Peacock, and Venettozzi.").

Miller and Venettozzi on notice to the fact that plaintiff was wrongfully removed from his disciplinary hearing in direct violation of [his] right to due process." Id. Plaintiff posits that Venettozzi's denial of his request for reconsideration was done with "deliberate indifference and in complete disregard to the unconstitutional conditions of confinement plaintiff was wrongfully subjected to by . . . Peacock at plaintiff's disciplinary hearing." Id. at ¶ 44.

Plaintiff further argues that his Fourteenth Amendment due process rights were violated because, "[w]hile housed in the SHU on the penalty imposed by defendant Peacock[,] plaintiff was subjected a[]typical and significant hardships." SAC at 8 ¶ 35. Plaintiff's alleged atypical and significant hardships include the following:

> [B]eing pat frisked, wonded [sic] with a metal detector, and shackled in body restraints every time plaintiff left his cell and escorted by between two and four security guards during escorts around GMCF and Upstate [CF], subjected to call frisk every 30 days, forced to use a SHU toothbrush which measured approximately three inches in length causing plaintiff gag reflect every time plaintiff brushed his teeth.

> [F]orced to use SHU deordorant [sic] which caked up under plaintiffs [sic] arms and did not have any significant odor protection, causing plaintiff to smell badly during his entire SHU confinement time, and causing plaintiff rash breakouts.

> [E]xtreme heat through the [Upstate] CF ventilation system pushing above average temperatures into plaintiffs [sic] SHU cell[], causing plaintiff to sweat perfusely [sic] throughout the day and night leaving puddles of sweat in plaintiffs [sic] bed causing plaintiff sleep deprivation, stress and uncomfortability [sic], with no fan.

> [T]he light being on in plaintiff's cell at all times also making it difficult for plaintiff to sleep.

> [P]laced in a kennel type recreation pen measuring approximately 10 feet long and 8 feet wide to exercise in,

> and not afforded any access to any recreation equipment at
> [Upstate] CF.
>
> [L]os[s of] approximately 20 pounds as a result of being
> under fed, and stripped of saved jewish [sic] kosher foods
> such as fruits, oatmeals [sic], cereal, and bread during
> random cell frisk, and plaintiff's food package privileges were
> wrongfully reinstated on July 19, 2017 instead of on plaintiff's
> SHU release date of June 19, 2017 causing plaintiff's food
> package to be wrongfully returned to sender once plaintiff
> was finally released from SHU confinement.
>
> [Denial of] regular and timely access to public notary
> services, law library access and legal materials needed to
> litigate, (such as carbon in writing paper), and denied timely
> access to the court, along with a denial of the free flow of his
> outgoing legal mail on more than one occasion while housed
> in SHU.
>
> [F]orced to use a SHU writing pen instead of a regular
> writing pen which caused significant pain in plaintiff's left
> hand while plaintiff handled enormous amounts of
> overwhelming legal work, plaintiff's typewriter was also
> seized/confiscated while plaintiff was wrongfully housed in
> the SHU.

Id. at 8-9 ¶¶ 35-41. Plaintiff seeks a total of $9,500 in "declaratory relief" and "[p]unitive damages." Id. at 13.


## II. Present Motion

### A. Defendants' Memorandum of Law and Supporting Evidence

Defendants first argue that plaintiff has failed to establish that his Fourteenth Amendment due process rights were violated because the alleged conditions of SHU were not atypical and, therefore, did not give rise to a protected liberty interest. See Dkt. No. 40-10 at 9. Defendants contend that, because plaintiff's SHU sentence was reduced to 90 days, the term of his confinement does not give rise to an inference of

atypical or significant hardship.  See id. at 10.  Further, defendants posit that the

conditions alleged in plaintiff's SAC "were typical of all inmates housed in SHU" and, to

a large extent, plaintiff merely complains of prison conditions which are set forth in the

regulations, which is an insufficient basis upon which to establish a due process

violation.  See id. at 10-11.  For instance, insofar as plaintiff alleges that he was subject

to frisks, placed in restraints before he was moved out of his cell, unable to participate in

congregate exercise, meals, or work assignments, permitted one hour of exercise

outside of his cell per day, and not provided notary services, defendants note that such

services and conditions are set forth by regulation pursuant to N.Y. COMP CODES R. &

REGS. tit. 7, §§ 305.1, 305.3(b), 304.3, and 304.8, respectively.  See id. at 11.  With

respect to plaintiff's inadequate food and weight loss claims, defendants submit

Venettozzi's sworn affidavit in which he explains that "inmates housed in SHU receive

meals of the same type as the 'meals available to inmates in general population and in

sufficient quantity to be nutritionally adequate.'"  Dkt. No. 40-2 at 4 ¶ 24 (quoting N.Y.

COMP CODES R. & REGS. tit. 7, § 304.2).

Concerning plaintiff's complaints about his toothbrush and deodorant, defendants

point to Venettozzi's declaration in which he explains that, "[e]very inmate housed in

SHU receives the same state-issued toiletries, such as toothbrushes and deodorant."

Dkt. No. 40-2 at 5 ¶ 26; see Dkt. No. 40-10 at 11.  Further, defendants contend that

plaintiff's claims that his SHU cell was too hot is conclusory and unsupported by any

evidence.  See Dkt. No. 40-10 at 11.  Defendants also cite plaintiff's deposition

testimony in which he stated that, aside from certain issues relating to notary services,

he "didn't grieve every issue."  Dkt. No. 40-9 at 60.  Plaintiff also testified at deposition

"yeah," in response to defense counsel's question, "[i]s it fair to say the hardships you experienced in SHU were the kind of hardships that other inmates in SHU experienced?"  Id. at 63.

Next, defendants contend that Peacock's removal of plaintiff from the Tier III disciplinary hearing did not violate plaintiff's due process rights.  See Dkt. No. 40-10 at 12.  Defendants aver that plaintiff was afforded all process due, as he "had notice of the charges against him, an opportunity to present evidence and witnesses in opposition, and an impartial hearing officer," and that Peacock removed him "only after warning him and only after he continued to be disruptive."  Id. at 12, 14.  Defendants argue that plaintiff waived his right to be present at the hearing by engaging in disruptive behavior and failing to heed Peacock's warnings that further disruptive behavior would result in his removal.  See id. at 19.  Defendants aver that "[p]laintiff's subjective belief that . . . Peacock had an ulterior motive for his removal is insufficient to raise a material question of fact."  Id.

Defendants also argue that plaintiff cannot validly assert that any prejudice resulting from his removal, as "he cannot identify any argument or noncumulative evidence that he was precluded from presenting."  Dkt. No. 40-10 at 12.  In this regard, defendants note that, "[a]t his deposition, plaintiff was unable to identify any evidence beyond asserting that 'there was another witness that was in 1 or 2 cell' and that he 'could have found another witness.'"  Id. at 17 (quoting Dkt. No. 49-9 at 48).  However, defendants aver, [b]y the conclusion of the hearing, . . . Peacock had taken testimony from three inmate witnesses, two staff witnesses, and plaintiff, as well as viewing video." Id.  Therefore, defendants argue, "[f]urther testimony bolstering plaintiff's version of

13

events would have been redundant and cumulative, and the denial of such a witness . . . would not violate due process. Id.  Further, defendants argue that Peacock properly based her decision on the testimony of plaintiff, plaintiff's three inmate witnesses, C.O. Iffert and Pritchard, and her own observation of the video footage of the incident. See Dkt. No. 40-10 at 18.  Defendants posit that "[s]uch evidence is sufficiently reliable to satisfy due process." Id.  Defendants contend that Peacock "credited the testimony of Officers Iffert and Pritchard over that of plaintiff and the inmate witnesses, as she was entitled to do." Id. at 17.  Moreover, defendants urge that, aside from plaintiff's conclusory assertions to the contrary, no evidence exists to establish that Peacock was anything but impartial. See id. at 16.  In addition, defendants argue that plaintiff's claims against Miller must be dismissed because plaintiff has failed to establish Miller's personal involvement in the alleged constitutional violations, as required to assert a claim pursuant to 42 U.S.C. § 1983. See id. at 19.  Defendants point out that the SAC "contains no specific allegations against . . . Miller" and that his supervisory status alone is insufficient to establish his personal involvement the alleged constitutional violations. Id.

Finally, defendants argue that Peacock is entitled to qualified immunity because "an inmate's right to be present at a prison disciplinary hearing is unsettled in the Second Circuit," and therefore, "it is not clearly established that removal of an inmate from a disciplinary hearing violates an established right." Dkt. No. 40-10 at 20 (internal quotation marks and citation omitted).  Defendants also posit that, "because the evidence presented at the hearing supported the guilty determinations, a reasonable person would not have known that [plaintiff's] confinement to SHU would violate a

protected liberty interest." Id. Moreover, defendants argue that Venettozzi is entitled to qualified immunity because "[t]he record demonstrates that . . . Peacock described [plaintiff's] behavior as disruptive[,]" and "Venettozzi was entitled to credit . . . Peacock's description of plaintiff's behavior and to rely on her discretion." Id. at 21.

### B. Plaintiff's Response in Opposition

In opposition to defendants' motion, plaintiff posits first that the conditions he experienced while in SHU as a result of Peacock's hearing decision were atypical and imposed upon him significant hardships sufficient to establish a protected liberty interest. See Dkt. No. 42 at 14. In support of this contention, plaintiff reiterates the list of conditions asserted in his SAC.[4] See id.; SAC at 8-9 ¶¶ 35-41. Plaintiff states that those conditions "caused significant emotional distress." Id.

Plaintiff argues that, "[w]hile housed in the SHU [he] also sustained atypical and significant hardships caused by the prison administrations deliberate indifference with [his] timely access to the [c]ourts on two separate occasions." Dkt. No. 42 at 17 (quotation marks omitted). He states that, "[d]uring [his] SHU confinement[, he] was forced to file several grievances concerning deprivation of notorial [sic] services," which he has attached as exhibits. Id. at 17; see Dkt. No. 42-1 at 2 (grievance dated Oct. 18, 2016 regarding notary services); 4 (grievance dated Oct. 24, 2016 re: notary services); 6 (grievance dated Nov. 3, 2016 re: notary services). Plaintiff also submits that he filed

---

[4]  The undersigned declines to pass on plaintiff's arguments in support of his opposition insofar as his pleading may be read as asserting First Amendment religious freedom claims based on, among other things, allegedly confiscated Kosher food and being prevented from attending religious services (Dkt. No. 42 at 15, 17) because "[p]laintiff withdrew his First Amendment claims." Dkt. No. 34 at 2; see Dkt. No. 24 at 4, 7; Dkt. No. 21 at 1.

numerous grievances relating to "the deprivation of a fair opportunity to properly clean

his cell" and his "timely access to the [c]ourts," and made "repeated requests while in

SHU for legal photocopies from the law library."  Id.; see Dkt. No. 42-1 at 29.  Plaintiff

posits that, "[w]hile in SHU [he] was forced to endure obstacles of his grievances being

confiscated or not filed."  Id.  In addition, plaintiff complains that he was "deprived

wrongfully of his privileges to participate in vocational programming, resulting from his

SHU confinement."  Id. at 18.  Thus, plaintiff avers, based on the foregoing, he "has

established that material questions of fact exist" and defendants are not entitled to

summary judgment as to whether the conditions of his confinement in SHU were

"atypical and imposed significant hardships in relation to the ordinary incidents of prison

life."  Id.

Next, plaintiff argues that "[q]uestions of material fact exist with regard to whether

or not [he] received the process to which he was entitled at his disciplinary hearing."

Dkt. No. 42 at 18.  Plaintiff states that his removal "deprived him of a full and fair

opportunity to present a defense" because it prevented him from "present[ing] physical

evidence in his defense" in so far as "Peacock failed to produce the video and voice

recording from the SHU housing gallery of the area in which th[e] alleged incident had

taken place."  Id.  Plaintiff posits that the video played at the hearing "was from the back

of the gallery where th[e] incident had taken place[,]" whereas "[t]he footage [he]

requested that would have supported [his] defense . . . was subsequently unavailable."

Id. at 19.  He also avers that CO Iffert's and Pritchard's testimony and the misbehavior

report were "fabricated."  Id. at 20.  Moreover, plaintiff contends that Venettozzi's

dismissal of the charge of demonstration evidences that Peacock's decision was not

16

based on sufficient evidence.  See id. at 26.  Plaintiff also reasserts his contentions that the hearing transcript does not support defendants' contention that he was disruptive, and that Peacock failed to "adequately identify the behavior that caused her to remove him from the hearing."  Id. at 21.

Further, plaintiff argues that "Peacock completely misrepresented the transcript of the hearing, particularly the portion right around plaintiffs [sic] removal."  Id.  Plaintiff states that "the corrected transcript clarify's [sic] substantial mischaracterization" and "creat[es] a dispute in itself concerning material facts in the matter at hand."  Id. at 20-21.  In support of these contentions, plaintiff cites to his Prisoners' Legal Service's counsel's reply affirmation in support of his Article 78 petition, in which counsel argued that defendants "mischaracterize[d] [p]laintiff's behavior during the hearing," and stated, as relevant here, that whereas "respondent's transcript incorrectly transcribes petitioner's statement 'Officer Whatever his name is, the fat due,' as 'Officer Birella, the fat dude[,]' [t]here is no mention of an Officer Birella anywhere in the hearing record, nor any indication that an Officer Birella exists at this facility or anywhere within DOCCS."  Dkt. No. 42-2 at 47.  Plaintiff's counsel also noted that respondent's transcript incorrectly stated that Peacock said she would "continue this hearing in extension," whereas it should have read "in absentia."  Id.  Attached to the Article 78 reply affirmation as an exhibit was one page of the transcript containing the correction "in absentia," among other typographical changes.  Id. at 51.

Finally, plaintiff argues that defendants are not entitled to qualified immunity. See Dkt. No. 42 at 29.  Liberally construed, plaintiff cites the New York State Supreme Court's Decision, Judgment and Order in support of this contention, which states that

17

plaintiff had a "fundamental right to be present at his disciplinary hearing." Id. at 21 (quoting Dkt. No. 40-3 at 4). He also posits that, because Peacock's hearing decision was subsequently modified and reversed, questions of fact exist as to "whether Peacock and Venettozzi acted reasonably in light of the circumstances and facts surrounding the matter of plaintiffs [sic] ejection from the hearing" or in determining that plaintiff violated DOCCS rules. Id. at 29.

### III. Legal Standard[5]

Summary judgment may be granted only if the submissions of the parties taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

---

[5] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  <u>See Salahuddin</u>, 467 F.3d at 272-73.  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  <u>Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  <u>See Spiegel v. Schulmann</u>, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (internal quotation marks and citation omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[6]  <u>See Colon v. Coughlin</u>, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .").  "To satisfy Rule 56(e), affidavits must be based upon concrete particulars, not conclusory allegations."  <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 111 (2d Cir. 1997) (internal quotation marks and citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 452 (2d Cir. 1999).  "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for

---

[6]  Plaintiff's SAC in this case was not properly verified.  <u>See</u> SAC at 12.

the plaintiff.'"  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

## IV. Analysis

### A. Personal Involvement of Defendant Miller

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Further, "the doctrine of *respondeat superior* cannot

be applied to section 1983 actions to satisfy the prerequisite of personal involvement.

Therefore, a prison official may not be found liable for a constitutional violation merely

because of the acts of those under his control." Kinch v. Artuz, No. 97-CV-2419 (LAP),

1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing Colon, 58 F.3d at 874 and

Wright, 21 F.3d at 501).  Thus, supervisory officials may not be held liable for their

subordinates' constitutional violations merely because they are in a position of authority.

See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Colon, 58 F.3d at 874

(holding that the fact that the defendant occupied a high-ranking position in the New

York prison hierarchy, without more, was insufficient to establish personal involvement);

Felix-Torres v. Graham, 687 F. Supp. 2d 38, 54 (N.D.N.Y. 2009) ("If the defendant is a

supervisory official, such as a [superintendent of a prison], a mere linkage to the

unlawful conduct through the prison chain of command (i.e., under the doctrine of

*respondeat superior*) is insufficient to show his or her personal involvement in that

unlawful conduct." (internal quotation marks and citations omitted)).  Rather, "a plaintiff

must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution."  Iqbal, 556 U.S. at 676.

Supervisory personnel may be considered personally involved in their

subordinate's conduct if:

> (1) the defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation
> through report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom;

> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the
> rights of inmates by failing to act on information indicating
> that unconstitutional acts were occurring.

Colon, 58 F.3d at 873 (citing Wright, 21 F.3d at 501 (additional citation omitted)).[7]

Here, liberally construed, the SAC appears to assert Miller's personal involvement based on the second Colon factor. The SAC alleges that plaintiff submitted his request for reconsideration of Venettozzi's modification to Venettozzi and Miller, thereby "placing . . . Miller and Venettozzi on notice to the fact that plaintiff was wrongfully removed from his disciplinary hearing in direct violation of plaintiff's right to due process." SAC at 10 ¶ 43. Plaintiff's request for reconsideration advanced the same arguments set forth in the SAC regarding plaintiff's allegedly improper removal from the Tier III disciplinary hearing. See Dkt. No. 40-5 at 3-4. Plaintiff's contention that he addressed his request for reconsideration to Miller, however, is belied by defendants' documentary evidence, namely plaintiff's Prisoner's Legal Services counsel's February 24, 2017 letter seeking reconsideration—which is addressed solely to Venettozzi. See id. at 2. Rather, the only documentary evidence establishing Miller's awareness of plaintiff's request for reconsideration is Venettozzi's response to plaintiff's counsel's request in which Venettozzi cc'd Miller. See id. at 1.

---

[7] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Although "[a]n appeal officer may be held liable for failure to correct a procedural due process error below[,]" Constant v. Annucci, No. 16-CV-3985 (NSR), 2018 WL 1684411, at *5 (S.D.N.Y. Apr. 5, 2018), "[i]t is well settled in the Second Circuit that merely receiving letters from an inmate and referring the letters to others does not constitute personal involvement for the purposes of Section 1983 liability." Banks v. Annucci, 48 F. Supp. 3d 394, 417-18 (N.D.N.Y. 2014). In the present case, neither plaintiff's allegations nor the documentary evidence establishes any involvement on the part of Miller beyond receiving notice of plaintiff's request for reconsideration of Venettozzi's February 2017 modification of Peacock's Tier III disciplinary determination by being cc'd on Venettozzi's response to plaintiff's counsel's letter. See Dkt. No. 40-5 at 1. However, plaintiff does not allege, and the documentary evidence does not establish, that Miller personally reviewed and/or affirmed Peacock's Tier III disciplinary determination. Cf. Johnson v. Coombe, 156 F. Supp. 2d 273, 278 (S.D.N.Y. 2001) ("The Second Circuit has held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allege that the superintendent was personally involved in depriving the prisoner of his due process right to call witnesses). Rather, at most, plaintiff's contention is analogous to cases in which a prison official receives a letter from an inmate, but refers it to another official, which is insufficient to establish personal involvement. See Banks, 48 F. Supp. 3d at 417-18. Moreover, plaintiff's arguments, insofar as directed at Miller, are premised on the fact that Miller is the superintendent of Great Meadow CF and, as such, "is . . . responsible for ensuing plaintiff received . . . due process in disciplinary proceedings filed against him by security staff and personnel under his command, plaintiff's health,

23

safety and fair treatment in accordance with institutional regulations." SAC at 4 ¶ 9. As discussed above, Miller's position in the hierarchy of the Great Meadow CF chain of command, without more, is insufficient to establish personal involvement. See Black, 76 F.3d at 74; Colon, 58 F.3d at 874; Felix-Torres, 687 F. Supp. 2d at 54. Accordingly, it is recommended that defendants' motion be granted insofar as it seeks dismissal of plaintiff's claims against Miller for lack of personal involvement.

## B. Due Process

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his

decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense.  See Wolff v. McDonald, 418 U.S. 539, 564-70 (1974); Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).

     The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to . . . an impartial hearing officer." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citing Wolff, 418 U.S. at 570-71). "Due process in this context requires only that the hearing officer's decision not be 'arbitrary.'"  Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12836864, at *4 (N.D.N.Y. Oct. 21, 2014) (quoting Wolff, 418 U.S. at 571), report and recommendation adopted, No. 9:13-CV-100 (FJS/TWD), 2016 WL 660919 (N.D.N.Y. Feb. 18, 2016).  A decision is not "arbitrary" if it is supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455 (1985).  "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling."  Sira, 380 F.3d at 69 (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)).  "[O]nly 'reliable' evidence can constitute 'some evidence.'"  Id. at 76 (quoting Luna, 356 F.3d at 488).  "In contrast to this 'extremely tolerant' federal standard, 'New York law requires prison disciplinary rulings to be supported by sufficiently relevant and probative information to constitute substantial evidence.  This requirement is sterner than the some evidence standard necessary to afford due process."  Kimbrough, 2014 WL 12836864, at *4 (quoting Sira, 380 F.3d at 69, 76 n.9  (additional citations omitted).

     Here, defendants have established entitlement to summary judgment dismissing plaintiff's procedural due process claims, in opposition to which, plaintiff has failed to demonstrate the existence of material questions of fact.  It is undisputed that plaintiff

received timely written notice of the charges against him, as plaintiff acknowledged at deposition that he was issued a copy of the October 7, 2016 misbehavior report on October 8, 2016, but "ripped it up because it was fabricated." Dkt. No. 40-4 at 2. Further, it is undisputed that plaintiff was offered, but refused employee assistance to prepare for his Tier III disciplinary hearing. See id. at 3. In addition, Peacock issued a written decision that included the evidence she relied on and her reasoning for her ultimate disposition. See Dkt. No. 40-4 at 22.

With respect to whether Peacock acted impartially, the undersigned first notes that "[t]he subsequent modification of [plaintiff's] determination during the administrative appeals process . . . does not impact the due process analysis," and that "[t]he outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred." Alexander v. Fischer, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y. Dec. 21, 2015) (citing Walker v. Bates, 23 F.3d 652, 657 (2d Cir. 1994) (additional citations omitted), report and recommendation adopted, No. 9:14-CV-548(GLS/ATB), 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016). The undersigned concludes that "some evidence" supported Peacock's hearing decision. Hill, 472 U.S. at 455. In reaching her decision, Peacock considered C.O. Iffert's misbehavior report, plaintiff's testimony, the testimony of the three inmate witnesses, C.O. Iffert's and Prichard's testimony, and the video footage of the B-1 SHU gallery at the time of the incident. See Dkt. No. 40-4 at 22. At the hearing, plaintiff testified that inmates in the B-1 SHU gallery were ""acting out in concert" on the date of the incident." Id. at 4. Further, Inmate Nelson, who was housed in 3 cell on the date of the incident, testified that, he could hear loud banging going on "to [plaintiff's] neighbor

which is 5 cell and (inaudible) just going downtown [sic] at 8 cell," id. at 13, and inmate

Craygo testified that he could hear plaintiff having a loud conversation with his neighbor.

See id. at 17.  In addition, Pritchard testified that, during the demonstration, he "could

see [plaintiff] on his cell yelling and . . . was banging on his cell," and informed C.O.

Iffert that the noise was coming from plaintiff's cell.  Id. at 19. Moreover, the misbehavior

report stated that, on the date of the incident, C.O. Iffert "observed [plaintiff] yelling

loudly despite direct orders to stop" and that plaintiff "was acting in concert with other

inmates on B-1 gallery to disrupt the order of the unit."  Dkt. No. 40-3 at 17.  Thus,

"some" or "a modicum" of evidence supported Peacock's determination that plaintiff

acted in violation of rules 104.12 (demonstration) and 104.13 (creating a disturbance).

Sira, 380 F.3d at 76; see N.Y. COMP. CODES R. & REGS. tit. 7, § 270.2 (Rule 104.12:

"[a]n inmate shall not lead, organize, participate, or urge other inmates to participate, in

a work-stoppage, sit-in, lock-in, or other actions which may be detrimental to the order

of facility." (emphasis added); (Rule 104.13: "An inmate shall not engage in conduct

which disturbs the order of any part of the facility.  This includes, but is not limited to,

loud talking in a mess hall, program area or corridor, talking after the designated facility

quiet time, playing a radio, television or tape player without a headphone or through a

headphone in a loud or improper manner, or playing a musical instrument in a loud or

improper manner.").  Similarly, "some evidence" supported Peacock's determination that

plaintiff violated rule 106.10 (direct order), including the misbehavior report and C.O.

Iffert's testimony in which he stated that he "told all of [the inmates in B-1 gallery] that

they were kinda making noise to be quiet and the direct order is anything that

(inaudible) uh anytime they creating [sic] a disturbance, they're already uh violating the

many rules and policies and procedures" in response to Peacock's question, ""when you stopped at 4 cell, did you give a direct order as your Misbehavior Report states?"  Dkt. No. 40-3 at 11.  The evidence Peacock relied on—the testimony of C.O. Iffert and Pritchard, the misbehavior report, and video footage—was sufficiently reliable for purposes of due process.  See Shabazz v. Bezio, 669 F. App'x 592, 593 (2d Cir. 2016) (summary order) ("testimony and a misbehavior report . . . were reliable evidence sufficient to support the charge."); Fulton v. Baltazar, No. 16-CV-6085 (JGK), 2018 WL 389097, at *5 (S.D.N.Y. Jan. 11, 2018) (holding that "video surveillance" of the incident constituted "reliable evidence.").  The fact that Venettozzi later modified Peacock's decision and dismissed the charge of demonstration because he concluded that the "misbehavior report d[id] not support th[at] charge," Dkt. No. 40-3 at 11 (capitalization omitted), or that the Supreme Court, applying a heightened standard of review, dismissed the charges, does not impact the foregoing due process analysis.  See Sira v. Morton, 380 F.3d 57, 69, 76 n.9; Alexander, 2015 WL 10568892, at *4.

Moreover, insofar as plaintiff's pro se pleadings may be read as asserting that Peacock improperly gave more weight to the testimony of C.O. Iffert and Pritchard, his argument is of no moment, as "[i]t is the province of the hearing officer, as the fact finder, to weigh the evidence and make findings of credibility," and, although an inmate "has the right to have witnesses called on his behalf, there is no corresponding right that the testimony of those witnesses be believed by the hearing officer."  Partak v. Behrle, No. 9:09-CV-1256 (FJS/ATB), 2011 WL 7629500, at *13 (N.D.N.Y. Sept. 12, 2011) (citing Hill, 472 U.S. at 455), report and recommendation adopted, No. 9:09-CV-1256 (FJS/ATB), 2012 WL 1037950 (N.D.N.Y. Mar. 27, 2012).  As discussed above, because

Peacock's decision was supported by "some evidence," the fact that Peacock found the officers' testimony more credible than plaintiff's and his witnesses does not state a constitutional claim.  See id.  To the extent plaintiff that plaintiff argues that the disciplinary hearing was the result of a false misbehavior report, see Dkt. No. 40-4 at 2, his conclusory assertion does not alter the foregoing analysis.  It is well settled that prison inmates have no constitutionally guaranteed immunity from being falsely or wrongfully accused of conduct for which they are subjected to a deprivation of a protected liberty interest provided that, as plaintiff was here, the prisoner was afforded sufficient procedural due process.  See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986).

In addition, the undersigned concludes that plaintiff's claims that he was not allowed to finish his objection to Pritchard's testimony or call two additional inmate witnesses, and/or present additional video footage fail to establish a constitutional violation.  See Dkt. No. 40-4 at 11; Dkt. No. 49-9 at 48.  As the record establishes, plaintiff called three inmate witnesses who all testified in his favor, presented video footage of the B-1 gallery from the day of the incident, and objected to the testimony of Pritchard.  See Dkt. No. 40-4 at 10, 12-18, 21.  Plaintiff has failed to provide any explanation as to how the two additional, unidentified witnesses would have provided testimony different to that of the three inmate witnesses who testified in his favor, and plaintiff never requested to call additional witnesses before his removal—which occurred immediately prior to the conclusion of the hearing.  See id. at 21.  Plaintiff has also failed to establish how he would have further objected to Pritchard's testimony beyond stating that it "came out of nowhere" and that he "was not able to properly

prepare for it."  Dkt. No. 40-4 at 21.  In any event, the undersigned is not aware of, and plaintiff does not cite to, any authority requiring inmates to be given prior notice of the testimony of institutional witnesses at a prison disciplinary hearing.  Moreover, plaintiff asserts only conclusory and self-serving statements in support of his position that additional video footage—beyond that which was viewed at his request—would have provided exculpatory evidence.  See Dkt. No. 42 at 19.

### 1. Removal from the Hearing—Qualified Immunity

"The Second Circuit ha[s] not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue."  Williams v. Korines, No. 9:16-CV-1157 (FJS/TWD), 2018 WL 5729353, at *15 (N.D.N.Y. Aug. 31, 2018) (quoting Cole v. New York State Dept of Corr. & Cmty. Supervision, No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *22 (N.D.N.Y. Aug. 25, 2016), report and recommendation adopted, No. 9:14-CV- 0539 (BKS/DEP), 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016)), report and recommendation adopted, No. 9:16-CV-1157 (FJS/TWD), 2018 WL 4521204 (N.D.N.Y. Sept. 21, 2018), aff'd, 966 F.3d 133 (2d Cir. 2020); Vogelfang v. Capra, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); see also Clark v. Dannheim, No. 02-CV-6525L (DGL), 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) ("[W]here an inmate

disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); Mims v. Ufland, No. 07-CV-1926 (DC), 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct).  In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights.  See Johnson v. Doling, No. 9:05-CV-376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right will "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.'"  Id. (citing Wolff, 418 U.S. at 566 (stating "we must balance the inmate's interest . . . against the needs of the prison, and some amount of flexibility and accommodation is required") (additional citation omitted).

Here, defendants argue that plaintiff was properly removed from the hearing after he became disruptive and failed to comply with Peacock's repeated instructions.  See Dkt. No. 40-10 at 16.  In opposition, plaintiff maintains that the record does not support that he was disruptive or engaged in behavior sufficient to warrant his removal and that Peacock failed to "adequately identify the behavior that caused her to remove him from the hearing."  Dkt. No. 42 at 21. As defendants aver, the hearing transcript appears to show that plaintiff failed to comply with Peacock's repeated instructions to halt his course of behavior, which she stated "continued long after the tape had stopped."  Dkt. No. 40-4 at 21; see Dkt. No. 40-10 at 16.  However, the hearing transcript is replete with

inaudible portions, making it impossible to definitively determine precisely what was said between Peacock and plaintiff in the moments prior to plaintiff's removal, aside from plaintiff's reference to a correction officer as "that fat dude." See Dkt. No. 40-4 at 21. Consequently, the undersigned cannot determine, based on the hearing transcript, whether Peacock's removal of plaintiff was justified on the basis that his behavior was sufficiently unruly and disruptive. See Cole, 2016 WL 5394752, at *22 (denying the defendants' motion for summary judgment as to the plaintiff's due process claim based on his removal from a prison disciplinary hearing where the hearing transcript was not part of the record before the court). However, as discussed above, plaintiff was afforded the opportunity to be present at the hearing and to exercise his basic due process rights, which he did by calling three witnesses, questioning the institutional witnesses, and presenting video evidence and requesting documentary evidence. See Subsection IV.B., supra. Therefore, pursuant to existing authority in this district, plaintiff's due process rights were arguably not violated by his removal just prior to the completion of the hearing. See Johnson, 2007 WL 3046701, at *8-9. In any event, the undersigned finds that Peacock and Venettozzi are entitled to qualified immunity on this claim.

### 2. Qualified Immunity

Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988) (quoting Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982)).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was 'objectively reasonable' for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991) (quoting Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

The determination of whether a government official is immune from suit is informed by two factors, namely whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct."  Terebesi v. Torreso, 764 F.3d 217, 230 (2d Cir. 2014) (citing Reichle v. Howards, 566 U.S. 658, 663 (2012)).  The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quotation marks, brackets, and citation omitted).  "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'"  Terebesi, 764 F.3d at 230 (quoting al-Kidd, 563 U.S. at 741).  However, "[e]ven where the law is clearly established and the scope of an official's permissible conduct is clearly defined, the qualified immunity defense also protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful."  Higazy v. Templeton, 505 F.3d 161, 169-70 (2d Cir. 2007) (internal quotation marks and citation

omitted).  This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." Malley v. Briggs, 475 U.S. 335, 341 (1986).

Here, at the time of plaintiff's disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at a disciplinary hearing, were not clearly established.  al-Kidd, 563 U.S. at 741; see Williams, 2018 WL 5729353, at *15; Vogelfang, 889 F. Supp. 2d at 514.  In addition, a person in Peacock's and Venettozzi's positions could have reasonably concluded that Peacock's decision to remove plaintiff from the hearing would not violate any clearly established constitutional right.  See Higazy, 505 F.3d at 169-70; Cole, 2016 WL 5394752, at *22; accord Higazy v., 505 F.3d at 169-70;  Malley, 475 U.S. at 341.  Accordingly, it is recommended that defendants' motion be granted insofar as it seeks summary judgment as to plaintiff's due process claims based on his removal from his Tier III disciplinary hearing on the ground that Peacock and Venettozzi are entitled to qualified immunity.

### 3. Conditions of SHU[8]

"To state a claim for procedural due process, there must first be a liberty interest which requires protection."  Lewis v. Murphy, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)).  To establish a procedural due process claim under § 1983, a plaintiff must

---

[8]  The undersigned declines to address plaintiff's claims that defendants' alleged conduct of denying him notary services, law library access, interference with his legal mail, and tampering with grievances caused his Court of Claims action (Claim No. 128886) to be dismissed as untimely.  See SAC at 9 ¶ 41; Dkt. No. 42 at 17.  Those claims are the subject of plaintiff's proposed Amended Complaint (Dkt. No. 48-1 at 3-4 ¶ 9; 6-7 ¶¶ 17-25) currently pending review in his separately pending lawsuit, Heyliger v. Doe #1 et al., 9:18-CV-336 (TJM/TWD).

show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004).  "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement."  Liao v. Malik, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases).  As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).  Although there are no bright-line rules for this inquiry, the Second Circuit has advised district courts that SHU confinements of fewer than 101 days, like the one at issue here, "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or [the] record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical."  Palmer v. Richards, 364 F.3d 60, 65 (2d Cir.2004); see Ortiz, 380 F.3d at 654 ("To be sure, with respect to 'normal' SHU confinement, we have held that a 101–day confinement does not meet the *Sandin* standard of atypicality." (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).

        As an initial matter, plaintiff's 90-day SHU confinement "was not long enough to constitute an atypical and significant deprivation by itself"; therefore, the undersigned must "look to the conditions of confinement" as alleged by plaintiff.  Smith v. Hamilton,

9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting

Palmer, 364 F.3d at 66).  Concerning the alleged SHU conditions, the undersigned

concludes that plaintiff has failed to establish that he was subjected to atypical and

significant hardship.  Insofar as plaintiff alleges that he was subject to frisks and/or

placed in restraints before he was moved out of his cell, he fails to allege that he was

subjected to conditions atypical of all SHU inmates.  See  N.Y. COMP CODES R. & REGS.

tit. 7, § 305.1(a)(1)-(2) ("On initial entry to . . . SHU, an inmate will be strip-frisked[:]

When an inmate is transferred from one facility disciplinary SHU to another facility

disciplinary SHU, he may be strip-frisked on exiting the facility but may not be strip-

searched or strip-frisked without probable cause upon entry to the receiving facility

and/or its SHU."); id. at § 305.1(b) ("An inmate will be pat-frisked whenever he goes out

of or returns to the SHU; and/or prior to and upon returning from any exercise periods,

hearings, interviews, etc."); id. at § 305.3(b) ("An inmate assigned to SHU will be placed

in mechanical restraints as described herein prior to exiting his or her cell.  If the inmate

is to remain under escort, the inmate shall be handcuffed in back without a waist chain.

If the inmate is not to remain under escort, the inmate shall be handcuffed in front with a

waist chain.  In order to accommodate the restraint procedure, the inmate will be

required to place his or her hands through the feed-up port, if available, or the partially

opened cell door.").  Further, to the extent plaintiff contends that he was permitted only

one hour of exercise outside of his cell per day, and unable to participate in congregate

exercise or meals, and not provided with sufficient food, his conditions were not atypical

of other SHU inmates and are belied by defendants' documentary evidence.  See id. at

§ 304.3 ("Inmates confined in the SHU must be permitted one hour of outdoor exercise

daily, exclusive of the time it takes to go to and return from the exercise area, beginning

on the day following admission."); id. at § 304.2(a)(" All food items will be delivered to

the inmates upon receipt from the food service area, and in a manner that will ensure

receipt of the food in an appropriate condition."); Dkt. No. 40-2 at 4 ¶ 24 (Venettozzi's

declaration, explaining that "inmates housed in SHU receive meals of the same type as

the 'meals available to inmates in general population and in sufficient quantity to be

nutritionally adequate.'" (quoting N.Y. COMP CODES R. & REGS. tit. 7, § 304.2))

Moreover, plaintiff fails to establish atypicality or significant hardship based on his

contention that his SHU confinement prevented him from working at his prison job. See

Palmer, 364 F.3d at 65 n.3 ("Under the normal conditions of SHU confinement in New

York, the prisoner is . . . denied various privileges available to general population

prisoners, such as the opportunity to work and obtain out-of-cell schooling." (internal

quotation marks and citations omitted); see also Crenshaw v. Hartman, 681 F. Supp. 2d

412, 414 (W.D.N.Y. 2010) ("It is well established that inmates have no right,

constitutional or otherwise, to any particular job or assignment within a prison.").

Similarly, plaintiff's assertions relating to the toothbrush and deodorant he was issued in

SHU fail to establish atypical conditions or significant hardship because, as defendants

have established through Venettozzi's sworn declaration explains, "[e]very inmate

housed in SHU receives the same state-issued toiletries, such as toothbrushes and

deodorant."  Dkt. No. 40-2 at 5.  Plaintiff's conclusory assertions to the contrary are

insufficient to demonstrate a triable issue of fact.  See Batista v. Union of

Needleworkers, No. 97-CV-4247 (HB), 2000 WL 1760923, at *3 (S.D.N.Y. Nov. 30,

2000) (holding that the plaintiff's "conclusory statements" offered "in response to [the]

defendant's evidence" were "insufficient as a matter of law to raise an issue of fact."); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.").

In addition, plaintiff's allegation that he was subjected to "extreme heat," SAC at 8 ¶ 37, is conclusory, unsupported by any evidence, and entirely contradictory of his allegations in his original complaint that he "suffered exposure to excessive cold" while housed in SHU. Dkt. No. 1 at 12. Indeed, the undersigned notes that plaintiff was confined in SHU at the time the incident giving rise to the present lawsuit occurred— during which time, based on the record before the Court, plaintiff did not make similar complaints relating to the temperature of his cell and does not allege that he was housed in a different SHU cell following the November 2016 guilty determination. See generally SAC. The undersigned therefore finds plaintiff's allegations relating to his SHU confinement conclusory, as plaintiff has made no effort to demonstrate how the conditions in SHU following the November 2016 guilty determination were so drastically different than those he experienced before that time and of which he made no mention of prior to Peacock's hearing decision. Consequently, it is recommended that defendants' motion in this regard be granted, and plaintiff's due process claims based on the conditions of SHU be dismissed.

## V. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 40) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED**, plaintiff's Second Amended Complaint (Dkt. No. 35) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[9]

Dated: December 14, 2020
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[9]  If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).